# 24-40103

# United States Court Of Appeals
## For The Fifth Circuit

# IN RE:
# SPACE EXPLORATION TECHNOLOGIES, CORPORATION,

*Petitioner.*

### ON APPEAL FROM
### SOUTHERN DISTRICT OF TEXAS, BROWNSVILLE

———————————

### BRIEF OF *AMICUS CURIAE*
### COALITION FOR A DEMOCRATIC WORKPLACE
### IN SUPPORT OF PETITIONER

———————————

**Alex T. MacDonald**
**LITTLER MENDELSON, P.C.**
**Workplace Policy Institute**
**815 Connecticut Avenue, NW**
**Suite 400**
**Washington, D.C.  20006-4046**
**(202) 772-2505**
**amacdonald@littler.com**

*Counsel for Amicus Curiae*
  *Coalition for a Democratic Workplace*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 29(a)(4), Amicus Coalition for a Democratic Workplace certifies that it has no parent corporation and that no publicly held corporation owns ten percent or more of its stock.

# TABLE OF CONTENTS

PAGE:

CORPORATE DISCLOSURE STATEMENT............................................................i

TABLE OF CONTENTS...................................................................................ii

TABLE OF AUTHORITIES..............................................................................iii

INTEREST OF AMICUS ...................................................................................1

SUMMARY OF ARGUMENT .............................................................................3

ARGUMENT.................................................................................................10

    I.    The Board processes claims that arise at common law........12

    II.    The Board awards traditional legal remedies......................15

    III.    The Board adjudicates disputes affecting core private rights ...................................................................................22

CERTIFICATE OF SERVICE ...........................................................................35

CERTIFICATE OF COMPLIANCE ....................................................................36

## TABLE OF AUTHORITIES

**PAGES(S):**

**CASES:**

*Acme Indus. Police,*
58 N.L.R.B. 1342 (1944) ............................................................... 21

*Agwilines, Inc. v. NLRB,*
87 F.2d 146 (5th Cir. 1936) .......................................... 16, 17, 18, 25

*Am. Fed'n of Lab. v. NLRB,*
308 U.S. 401 (1940) ........................................................................ 12

*Apex Hosiery Co. v. Leader,*
310 U.S. 469 (1940) ........................................................................ 14

*Atlanta Opera, Inc.,*
372 N.L.R.B. No. 95 (2023) ............................................................ 31

*Atlas Roofing Co. v. OSHRC,*
430 U.S. 442 (1977) .......................................................... 11, 24, 25

*Axon Enter., Inc. v. FTC,*
598 U.S. 175 (2023) ...................................................... 5, 23, 24, 29

*Bexar Cnty. Performing Arts Ctr. Found.,*
372 N.L.R.B. No. 28, 2022 WL 18107715
(Dec. 16, 2022) .................................................................... 6, 27, 30

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York,*
10 N.Y.3d 187 (2008) ..................................................................... 20

*Birth Ctr. v. St. Paul Companies, Inc.,*
787 A.2d 376 (Pa. 2001) .......................................................... 19, 20

*Boeing Co.,*
365 N.L.R.B. No. 154 (2017) .......................................................... 32

*Cap. Med. Ctr. v. NLRB,*
    909 F.3d 427 (D.C. Cir. 2018) .......................................... 29

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021) ....................................................... 30

*Chamber of Com. of U.S. v. Brown,*
    554 U.S. 60 (2008) ......................................................... 30

*Chamber of Com. of U.S. v. NLRB,*
    No. 6:23-CV-00553, 2024 WL 1203056
    (E.D. Tex. Mar. 18, 2024) ............................................. 31

*Commodity Futures Trading Comm'n v. Schor,*
    478 U.S. 833 (1986) ......................................................... 8

*Commonwealth v. Hunt,*
    45 Mass. 111 (1842) ...................................................... 14

*Commonwealth v. Pullis,*
    3 Doc. Hist. of Am. Ind. Soc. 59 (1806) ........................ 13

*Consol. Edison Co. of New York v. NLRB,*
    305 U.S. 197 (1938) ..................................................26-27

*Crowell v. Benson,*
    285 U.S. 22 (1932) ................................................. 16, 24

*Crump v. Commonwealth,*
    6 S.E. 620 (Va. 1888) .................................................... 13

*FedEx Home Delivery,*
    361 NLRB 610 (2014) ................................................31-32

*Granfinanciera, S.A. v. Nordberg,*
    492 U.S. 33 (1989) ............................................... *passim*

*Gutierrez-Brizuela v. Lynch,*
    834 F.3d 1142 (10th Cir. 2016) ...................................8-9

*Heartland Plymouth Ct. MI, LLC v. NLRB,*
    838 F.3d 16 (D.C. Cir. 2016) ........................................................ 21

*Hennington v. Smith,*
    No. 11-00-00180-CV, 2001 WL 34373429
    (Tex. App. Mar. 8, 2001) ...................................................... 5, 19, 20

*Hodges v. Easton,*
    106 U.S. 408 (1882) .............................................................. 8, 33

*In re Debbs,*
    158 U.S. 564 (1895) ................................................................. 25

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022), *affirmed,*
    No. 22-451 (2024) (Jarkesy I) ............................................... *passim*

*Loper Bright Enters. v. Raimondo,*
    No. 22-451 (U.S. Jan. 17, 2024) ................................................... 32

*Lutheran Heritage Village-Livonia,*
    343 NLRB 646 (2004) ................................................................ 32

*McLaren McComb,*
    372 N.L.R.B. No. 58, 2023 WL 2158775 (Feb. 21, 2023) ................ 6

*Mitchel v. Reynolds,*
    24 Eng. Rep. 347 (1711) ............................................................ 28

*Murray v. Hoboken Land & Imp. Co.,*
    59 U.S. 272 (1855) ................................................................... 16

*Nat'l Licorice Co. v. NLRB,*
    309 U.S. 350 (1940) .............................................................. 25, 26

*NLRB v. Jones & Laughlin Steel Corp.,*
    301 U. S. 1 (1937) ......................................................... 16, 17, 25, 26

*NLRB v. Loc. 490, Int'l Hod Carriers Bldg. &*
*Const. Laborers Union, AFL-CIO,*
    300 F.2d 328 (8th Cir. 1962) ......................................................... 12

*N. Pipeline Const. Co. v. Marathon Pipeline Co.,*
    458 U.S. 50 (1982) ................................................................. 22-23

*Phelps Dodge Corp. v. NLRB,*
    313 U.S. 177 (1941) .................................................................... 26

*Purple Commc'ns, Inc.,*
    361 N.L.R.B. 1050 (2014) ...................................................... 27, 28

*Quinn v. Leathem,*
    A.C. 495 (Eng.) (1901) ............................................................ 4, 12

*Rio All-Suites Hotel and Casino,*
    368 N.L.R.B. No. 143 (2019) ...................................................... 27

*San Diego Bldg. Trades Council,*
*Millmen's Union, Loc. 2020 v. Garmon,*
    359 U.S. 236 (1959) .................................................................... 14

*SEC v. Jarkesy,*
    No. 22-451 (U.S. June 27, 2024) (Jarkesy II) ...................... *passim*

*SpaceX Expl. Tech. Corp. v. NLRB,*
    No. 1:24-cv-00001 (Feb. 2, 2024) .................................................. 22

*State v. Glidden,*
    8 A. 890 (Conn. 1887) .................................................................. 12

*Stericycle, Inc.,*
    372 N.L.R.B. No. 113 (2023) ................................................. 28, 32

*SuperShuttle DFW, Inc.,*
    367 NLRB No. 75 (2019) ............................................................. 31

*Switchmen's Union of N. Am. v. Nat'l Mediation Bd.,*
    320 U.S. 297 (1943) .................................................................... 24

vi

*Tesla, Inc. v. NLRB.*,
  86 F.4th 640 (5th Cir. 2023) ......................................................... 29

*Thomas v. Union Carbide Agr. Prod. Co.*,
  473 U.S. 568 (1985) ...................................................................... 25

*Thryv, Inc.*,
  372 N.L.R.B. No. 22, 2022 WL 17974951 (Dec. 13, 2022) ..... *passim*

*Thryv, Inc. v. NLRB*,
  No. 23-60132, 2024 WL 2501700 (5th Cir. May 24, 2024) ............ 21

*Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*,
  489 U.S. 426 (1989) ...................................................................... 12

*Tull v. United States*,
  481 U.S. 412 (1987) ................................................................ 10, 15

*United States v. Addyston Pipe & Steel Co.*,
  85 F. 271 (6th Cir. 1898) .............................................................. 28

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ........................................................................ 4

*Va. Elec. & Power Co. v. NLRB*,
  319 U.S. 533 (1943) ...................................................................... 27

*Valley Hosp. Med. Ctr., Inc. v. NLRB*,
  93 F.4th 1120 (9th Cir. 2024) .......................................................... 7

*Vanderbeek v. Vernon Corp.*,
  50 P.3d 866 (Colo. 2002) ............................................................... 19

*Vegelahn v. Guntner*,
  167 Mass. 92 (1896) ................................................................... 4, 13

*Verifone, Inc. v. A Cab, LLC*,
  No. 215CV00157GMNGWF, 2015 WL 6443126
  (D. Nev. Oct. 23, 2015) ................................................................ 19

*Whole Foods Market, Inc.*,
     363 NLRB 800 (2015) .................................................................... 32

*W.R. Hansen v. LKA Gold Inc.*,
     816 F. App'x 259 (10th Cir. 2020) ......................................... 19, 20

STATUTES:

29 U.S.C. § 151 ................................................................................ 25, 26

29 U.S.C. § 153 ......................................................................................... 26

29 U.S.C. § 158 ........................................................................................... 3

29 U.S.C. § 158(a)(1) ................................................................................. 4

29 U.S.C. § 158(b)(1) ......................................................................... 4, 12

29 U.S.C. § 158(b)(2) ............................................................................... 12

29 U.S.C. § 158(b)(4) ......................................................................... 4, 13

29 U.S.C. § 158(c) ..................................................................................... 30

29 U.S.C. § 160(a) ............................................................................... 3, 12

29 U.S.C. § 160(b) ..................................................................................... 3

29 U.S.C. § 160(c) ............................................................................... 16, 17

29 U.S.C. § 160(e) ..................................................................................... 3

CONSTITUTIONAL PROVISIONS:

U.S. Const. amend. I ............................................................................... 30

U.S. Const. amend. V ............................................................................... 30

U.S. Const. amend. VII ................................................................... *passim*

REGULATIONS:

29 C.F.R. § 101.10 ....................................................................... 3

29 C.F.R. § 101.11(a) .................................................................. 4

29 C.F.R. § 101.12 ....................................................................... 3

RULES:

Fed. R. App. P. 29(a)................................................................. 1, 2

OTHER AUTHORITIES:

Alexander T. MacDonald,
*Originalism, Social Contract, and Labor Rights*,
    99 N. Dakota L. Rev. 27 (2024) ..................................... 24

Alexander T. MacDonald,
*Secondary Picketing, Trade Restraints, and the First Amendment:*
*A Historical and Practical Case for Legal Stability*,
    40 Hosftra Lab. & Emp. L.J. 1 (2022)............................ 14

Alexander T. MacDonald,
*The Labor Law Enigma: Article III, Judicial Power,*
*and the National Labor Relations Board*,
    24 Fed. Soc'y Rev. 304 (2023).......................................... 8

Altmon Lindsey,
The Pullman Strike: The Story of a Unique
Experiment of a Great Labor Upheaval (1942) ...................... 26

Amy Semet,
*Political Decision-Making at the National Labor Relations Board:*
*An Empirical Examination of the Board's Unfair Labor Practice*
*Decisions through the Clinton and Bush II Years*,
    37 Berkley J. Emp. & Lab. L. 223 (2016) .............. 6, 7, 33

Caleb Nelson,
*Adjudication in the Political Branches*,
    107 Colum. L. Rev. 559 (2007) .............................................. *passim*

Catherine L. Fisk & Deborah C. Malamud,
*The NLRB in Administrative Law Exile: Problems with
Its Structure and Function and Suggestions for Reform*,
    58 Duke L.J. 2013 (2009) ................................................................ 7

Christopher J. Walker,
*What SEC v. Jarkesy Means for the
Future of Agency Adjudication*, Yale J. on Regulation:
Notice & Comment (June 27, 2024),
https://www.yalejreg.com/nc/what-sec-v-jarkesy-means-for-the-
future-of-agency-adjudication/ ................................................. 11

Gary Minda,
*The Common Law, Labor and Antitrust*,
    11 Indus. Rel. L.J. 461 (1989) ....................................................... 13

Harrison,
*Jurisdiction, Congressional Power, and Constitutional Remedies*,
    86 Geo. L. J. 2513 (1998) .............................................................. 23

James A. Gross,
The Making of the National Labor Relations Board:
A Study in Economics, Politics, and the Law (1974) ............................. 25

James J. Brudney,
*Isolated and Politicized: The NLRB's Uncertain Future*,
    26 Comp. Lab. L. & Pol'y J. 221 (2005) ......................................... 33

John Locke,
Second Treatise on Government (Dover ed. 2002) ................................. 23

John V. Orth,
Combination and Conspiracy:
A Legal History of Trade Unionism (1991) ...................................... 13-14

Michael C. Harper,
*The Case for Limiting Judicial Review of
Labor Board Certification Decisions,*
    55 Geo. Wash. L. Rev. 262 (1987) ................................................. 32

Michael J. Lotito, Maury Baskin & Missy Parry,
Coalition for a Democratic Workforce,
Was the Obama NLRB the Most Partisan in History? (2016)
Available online: http://myprivateballot.com/wp-
content/uploads/2016/12/CDW-NLRB-Precedents-.pdf ..................... 8, 32

NLRB Gen. Counsel Memo. No. 21-04 (Aug. 12, 2021) ......................... 27

NLRB Gen. Counsel Mem. No. 22-04 (April 7, 2022)
Available online: https://www.nlrb.gov/news-outreach/news-
story/nlrb-general-counsel-jennifer-abruzzo-issues-memo-on-
captive-audience-and .......................................................................... 6, 30

NLRB Gen. Counsel Memo. No. 23-02 (Oct. 31, 2022) ......................... 29

NLRB Gen. Counsel Memo. No. 23-09 (May 30, 2023) .......................... 28

Philip Hamburger,
Is Administrative Law Unlawful? (2014) ............................................... 23

Richard Harrison Winters,
*Employee Handbooks and Employment-at-Will Contracts,*
    1985 Duke L.J. 196 (1985) ............................................................ 28

Ross E. Davies,
*Remedial Nonacquiescence,*
    89 Iowa L. Rev. 65 (2003) ............................................................. 21

Samuel Estreicher,
*Nonacquiescence by Federal Administrative Agencies,*
    98 Yale L.J. 679 (1989) ................................................................. 21

Thomas W. Merrill,
*Article III, Agency Adjudication, and the Origins of the
Appellate Review Model of Administrative Law*,
111 Colum. L. Rev. 939 (2011) ...................................................... 17

William B. Gould IV,
*Politics and the Effect on the National Labor
Relations Board's Adjudicative and Rulemaking Process*,
64 Emory L.J. 1501 (2015) ............................................................. 7

William Forbath,
Law and the Shaping of the American Labor Movement (1991) ........... 25

**INTEREST OF AMICUS**

The Coalition for a Democratic Workplace (CDW) represents millions of businesses that employ tens of millions of workers across the country in nearly every industry. Its purpose is to combat regulatory overreach by the National Labor Relations Board, which though expansive interpretations of its own authority, has threatened the wellbeing of employers, employees, and the national economy. CDW has especially opposed the Board's efforts to expand its own remedial authority—in part because that expansion conflicts with core structural limitations of the federal system and violates Americans' constitutional rights.

CDW submits this amicus brief to help deepen the Court's knowledge of these issues. In particular, the brief shows how the Board has expanded its regulatory authority into new subject areas and how that expansion has affected core private rights—the rights at the heart of the Seventh Amendment.

CDW files this brief under Federal Rule of Appellate Procedure 29(a). Counsel for all parties have been notified and have consented to the filing. In accordance with Federal Rule of Appellate Procedure

29(a), CDW states that no party's counsel authored this brief, no party or its counsel contributed money to prepare the brief, and no person other than CDW, its members, or its counsel contributed money intended to fund the preparation or submission of the brief.

## SUMMARY OF ARGUMENT

This appeal asks whether the National Labor Relations Board, as it currently operates, violates the Seventh Amendment. The answer is yes.

The Seventh Amendment guarantees access to a jury in all "suits at common law." U.S. Const. amend. VII. For the Amendment's purposes, "suits at common law" have three features: they mirror common-law claims that existed in 1791; they award traditional legal remedies; and they affect private, as opposed to public, rights. *See SEC v. Jarkesy (Jarkesy II)*, No. 22-451, slip op. at 7–8 (U.S. June 27, 2024); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 51 (1989). *See also Jarkesy v. SEC (Jarkesy I)*, 34 F.4th 446, 453 (5th Cir. 2022), *affirmed,* No. 22-451, *supra*. All three features are present in Board proceedings.

One of the Board's main jobs is to process "unfair labor practice" charges. *See* 29 U.S.C. §§ 158, 160(a). It does that through a purely administrative process. *Id.* § 160(b). This process sends charges first to an administrative law judge, then to the Board itself. 29 C.F.R. §§ 101.10, 101.12. The Board's decision is then subject to limited review in a U.S. court of appeals. 29 U.S.C. § 160(e). But even then, the court

focuses on the Board's conclusions of law; it defers to the Board's findings of fact. *See id.*; *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). The main factfinder is always an administrative official, never a jury. *See* 29 C.F.R. § 101.11(a) (stating that "facts and conclusions, as well as the reasons for the determinations on all material issues," are prepared by the administrative law judge).

That feature conflicts with the Seventh Amendment because the Board today often processes "suits at common law." Modern unfair labor practices have direct parallels in the common law, including common-law claims for interference with business relations and unlawful restraint of trade. *Compare* 29 U.S.C. § 158(a)(1) & (b)(1) (making it an unfair labor practice to coerce a person to join or not join a union), & (b)(4) (making certain secondary labor picketing an unfair labor practice), *with Vegelahn v. Guntner*, 167 Mass. 92, 98–99 (1896) (treating labor picketing as a form of coercion actionable under common-law tort doctrine), *and Quinn v. Leathem* [1901] A.C. 495 (Eng.) (applying longstanding common-law principles against coercion against nonmember laborers). They also carry traditional legal remedies. Under modern practice, the Board can award all pecuniary

costs directly or foreseeably resulting from an unfair labor practice. *Thryv, Inc.*, 372 N.L.R.B. No. 22, 2022 WL 17974951, at *9 (Dec. 13, 2022). Those costs are indistinguishable from common-law consequential damages. *Cf. Hennington v. Smith*, No. 11-00-00180-CV, 2001 WL 34373429, at *3 (Tex. App. Mar. 8, 2001) ("Consequential damages may be recoverable if they are both foreseeable and directly traceable to the wrongful act."). They are common-law remedies in everything but name. *Cf. Granfinanciera*, 492 U.S. at 52 (explaining that Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal").

What's more, the Board awards these remedies in cases affecting core private rights. Core private rights include life, liberty, and property rights. *See, e.g.*, *Jarkesy II*, No. 22-451, slip op. at 1 (Gorsuch, J., concurring); *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 198 (2023) (Thomas, J., concurring). *See also* Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 567–69 (2007) (discussing historical development and context of the concept). The Board affects those rights in a myriad of ways: it requires private businesses to give

unions access to their property, to refrain from contracting for confidentiality and nondisparagement, and to refrain from holding meetings to speak about labor issues during work time. *See, e.g.*, *Bexar Cnty. Performing Arts Ctr. Found.*, 372 N.L.R.B. No. 28, 2022 WL 18107715, at *1 (Dec. 16, 2022) (property access); *McLaren McComb*, 372 N.L.R.B. No. 58, 2023 WL 2158775, at *1 (Feb. 21, 2023) (nondisparagement and confidentiality in severance agreements); NLRB Gen. Counsel Mem. No. 22-04 (April 7, 2022)[1] (employer speech). Each of those requirements affects core private rights, and thus implicates the Seventh Amendment. *See Granfinanciera*, 492 U.S. at 51; *Jarkesy II*, No. 22-451, slip op. at 1 (Gorsuch, J., concurring). *See also Jarkesy I*, 34 F.4th at 453.

The Board's structure would violate the Seventh Amendment even if it resolved disputes neutrally and according to their merits. But lamentably, it does not. Instead, it often sacrifices law in favor of politics, deciding cases less on the merits of the dispute than on the identities of the parties. *See, e.g.*, Amy Semet, *Political Decision-Making*

---

[1] Available online: https://www.nlrb.gov/news-outreach/news-story/nlrb-general-counsel-jennifer-abruzzo-issues-memo-on-captive-audience-and.

*at the National Labor Relations Board: An Empirical Examination of the Board's Unfair Labor Practice Decisions through the Clinton and Bush II Years*, 37 Berkley J. Emp. & Lab. L. 223, 227 (2016) (finding statistically significant connection between political party and vote record for or against labor organizations). *See also* Catherine L. Fisk & Deborah C. Malamud, *The NLRB in Administrative Law Exile: Problems with Its Structure and Function and Suggestions for Reform*, 58 Duke L.J. 2013, 2020 (2009); William B. Gould IV, *Politics and the Effect on the National Labor Relations Board's Adjudicative and Rulemaking Process*, 64 Emory L.J. 1501, 1506 (2015) (noting that each new President may produce an expeditious change through administrative appointments—a difference which has led to the characterization of the Board as on a 'seesaw.'"). Board members from one party invariably side with labor; members from the other party, with management. *See* Semet, *supra*, at 227. And those voting patterns have caused Board to change policy dramatically from administration to administration. With each passing election, it has shifted its own "law" and thus subjected private rights to political winds. *See Valley Hosp. Med. Ctr., Inc. v. NLRB*, 93 F.4th 1120, 1129 (9th Cir. 2024)

(O'Scannlain, J., concurring) ("[T]he Board is not changing labor law through incremental progression. Rather, it veers violently left and right, a windsock in political gusts."). *See also* Michael J. Lotito, Maury Baskin & Missy Parry, Coalition for a Democratic Workforce, Was the Obama NLRB the Most Partisan in History? 3 (2016)[2] (reporting that Board during Obama administration overturned more of its own precedent than at any time in its history); Alexander T. MacDonald, *The Labor Law Enigma: Article III, Judicial Power, and the National Labor Relations Board*, 24 Fed. Soc'y Rev. 304, 328–29 (2023) (describing cycle of reversals upon reversals during last three presidential administrations).

That kind of politically motivated decision-making is exactly what the Seventh Amendment was designed to prevent. *See Hodges v. Easton*, 106 U.S. 408, 412 (1882) ("[T]he trial by jury is a fundamental guaranty of the rights and liberties of the people."). *See also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (explaining that separation of powers protects individual rather than structural

---

[2] Available online: http://myprivateballot.com/wp-content/uploads/2016/12/CDW-NLRB-Precedents-.pdf.

interests); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1150 (10th Cir. 2016) (Gorsuch, J.) (observing that the founders separated the branches into different spheres in part to "avoid the possibility of allowing politicized decisionmakers to decide cases and controversies"). This Court should not allow it to continue. The Court should hold that, as the Board currently operates, it unconstitutionally denies private parties access to a jury.

# ARGUMENT

The Seventh Amendment guarantees the right to a jury trial in all "suits at common law." Though the Amendment refers to the common law, it covers more than just claims that existed in 1791. *See Tull v. United States*, 481 U.S. 412, 417 (1987). It also covers more recent claims with common-law parallels, including claims under federal statutes. *Id.* at 417, 421. *See also Jarkesy II*, No. 22-451, slip op. at 7–8 (Gorsuch, J., concurring); *Jarkesy I*, 34 F.4th at 453.

To decide whether a claim has a common-law parallel, a court must follow a two-step analysis. *Jarkesy I*, 34 F.4th at 453 (citing *Tull*). First, the court must decide whether a claim "arises at common law." *Id.* That question requires the court to consider both the claim itself and the potential remedy. *Granfinanciera*, 492 U.S. at 42. At this stage, the remedy is more important than the claim. *Id.* Second, if the claim does "arise at common law," the court must decide whether it can still be assigned to an agency under the Supreme Court's "public rights" doctrine. *See Jarkesy II*, No. 22-451, slip op. at 13–18. *See also Jarkesy*

*I*, 34 F.4th at 453 (citing *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 454 n.11, 461 (1977)).[3]

The Board's process fails at both steps. As the Board operates today, it processes traditional common-law claims and awards common-law remedies. It also resolves disputes affecting core private rights. And at no point does it offer access to a jury. Its structure therefore violates the Seventh Amendment.

---

[3] *Atlas Roofing* may no longer be good law. In *Jarkesy*, the Supreme Court did not explicitly overrule the decision. But it appeared to read *Atlas Roofing* narrowly to cover only statutory claims that carry no "common-law soil." *Jarkesy II*, No. 22-859, slip op. at 23. And some analysts—as well as the *Jarkesy* dissent—understood the Court's decision as effectively overruling the case. *See id.* at slip op. 25 n.8 (Sotomayor, dissenting) (observing that the majority "leaves open the possibility" that *Atlas Roofing* may already have been overruled); Christopher J. Walker, *What SEC v. Jarkesy Means for the Future of Agency Adjudication*, Yale J. on Regulation: Notice & Comment (June 27, 2024), https://www.yalejreg.com/nc/what-sec-v-jarkesy-means-for-the-future-of-agency-adjudication/ (questioning *Atlas Roofing*'s continued weight as precedent). Its continued vitality is in considerable doubt. *See Jarkesy II*, No. 22-859, slip op. at 25 n.4 (describing *Atlas Roofing* as a "departure from our legal traditions"); Walker, *supra* ("Although the Chief Justice goes to great lengths to distinguish the civil penalty statutory scheme in *Jarkesy* from that in *Atlas Roofing*, he also seems to bury the precedent, especially in footnotes three and four.").

## I.    The Board processes claims that arise at common law.

To start, the Board processes claims with direct common-law
parallels. One of the Board's core functions is to police "unfair labor
practices." 29 U.S.C. § 160(a). *See also Am. Fed'n of Lab. v. NLRB*, 308
U.S. 401, 405 (1940). Many of these practices stem from (and often
replace) common-law torts. For example, it is an unfair labor practice to
coerce a person into striking, joining a union, or otherwise refusing to
work. 29 U.S.C. § 158(b)(1). *See also Trans World Airlines, Inc. v. Indep.
Fed'n of Flight Attendants*, 489 U.S. 426, 436–37 (1989) (noting that the
NLRA protects an employee's decision not to strike). It is also an unfair
labor practice to persuade an employer to discriminate against
nonunion members. *See* 29 U.S.C. § 158(b)(2); *NLRB v. Loc. 490, Int'l
Hod Carriers Bldg. & Const. Laborers Union, AFL-CIO*, 300 F.2d 328,
330 (8th Cir. 1962). But that same conduct would have supported a
common-law claims for interference with contractual relations or
unlawful restraint of trade. *See, e.g.*, *State v. Glidden*, 8 A. 890, 897
(Conn. 1887) (treating an effort to induce employer to discharge a
nonunion worker as a common-law conspiracy). *See also Quinn*, A.C.
495 ("It is plainly legal now for workmen to combine not to work except

on their own terms. On the other hand, it is clearly illegal for them or anyone else to use force or threats of violence to prevent other people from working on any terms which they think proper."). *Cf.* Gary Minda, *The Common Law, Labor and Antitrust*, 11 Indus. Rel. L.J. 461, 482 n.82 (1989) ("While the eighteenth-century law of England permitted the individual to unilaterally seek better wages and working conditions, it regarded the combined effort on the part of workers as a threat to free trade.").

Similarly, it can be an unfair labor practice to picket or boycott certain "secondary" employers. 29 U.S.C. § 158(b)(4). But that same kind of picketing could have supported common-law tort claims, including conspiracy. *See, e.g.*, *Crump v. Commonwealth*, 6 S.E. 620, 630 (Va. 1888) (treating secondary boycott as an actionable tort at common law); *Vegelahn*, 167 Mass. at 97 (same); *Commonwealth v. Pullis*, 3 Doc. Hist. of Am. Ind. Soc. 59 (1806),[4] (charging leaders of cordwainers' society with coordinated labor boycott against the common law). *See also* John V. Orth, Combination and Conspiracy: A Legal

---

[4] Available online: https://blogs.umass.edu/ulaprog/files/2008/06/commonwealth-v-pullis.pdf.

13

History of Trade Unionism 155 (1991) (explaining that the English common law was "inherently hostile" to labor's "organizational aspirations"); Alexander T. MacDonald, *Secondary Picketing, Trade Restraints, and the First Amendment: A Historical and Practical Case for Legal Stability*, 40 Hosftra Lab. & Emp. L.J. 1, 23 (2022) [hereinafter Secondary Picketing & Trade Restraints] (describing common-law treatment of secondary boycotts as a crime and later a tort).

Those torts, of course, have been mostly supplanted by the NLRA. *See San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 243 (1959) (holding that NLRA preempted state-law action to recover damages for alleged recognitional picketing while noting that the parties assumed "the behavior of the petitioning unions constituted an unfair labor practice"). And even before the NLRA, some states were moving away from recognizing them in labor disputes. *See Commonwealth v. Hunt*, 45 Mass. 111, 123 (1842) (holding that common-law conspiracy doctrine did not apply to peaceful labor organization designed to raise members' wages). Some states had even moved to abolish these torts by statute. *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 503 n.23 (1940) (discussing statutory reform). But none of

that history erases the common-law roots of certain unfair labor practices. Those practices still translate common-law tort concepts into statutory law. They are claims with close common-law parallels and therefore "arise at common law." *Cf. Tull*, 481 U.S. at 421 (finding close parallels between common-law nuisance actions and suit under the Clean Water Act when both served the same "essential function"); *Jarkesy I*, 34 F.4th at 453–54 (finding close parallel between common-law fraud action and securities-fraud suit under the modern securities statutes). *Cf. also Jarkesy II*, No. 22-451, slip op. at 12 (Sotomayor, J., dissenting) (suggesting that the majority's reasoning in *Jarkesy II*, which addressed SEC fraud proceedings, applies with the same force to other agencies, including the Board).

## II.    The Board awards traditional legal remedies.

The modern Board also awards common-law remedies. Though these remedies are a novel development, they still bring the Board into direct conflict with the Seventh Amendment. *Cf. Tull*, 481 U.S. at 421 (explaining that a parallel remedy is more important to the analysis than a parallel claim). They therefore support the appellant's position and undermine the Board's entire structure.

Historically, courts viewed the Board's remedial powers as equitable. The Board enforced its decisions through "cease-and-desist" orders, which directed only "prospective" relief. *See* 29 U.S.C. § 160(c); *Agwilines, Inc. v. NLRB*, 87 F.2d 146, 150–51 (5th Cir. 1936). That understanding flowed from early judicial views of agency "adjudication," which wasn't really adjudication at all. It was merely a side effect of executing the law. *See, e.g.*, *Crowell v. Benson*, 285 U.S. 22, 53–55 (1932) (describing role of administrative officials in administration and initial factfinding); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U. S. 1, 48 (1937) (describing Board's role as an "aid to enforcement"). *See also* Nelson, *supra*, at 563, 609 (surveying nineteenth-century precedents). In executing a law—say, by setting tariff rates—an agency might find facts apply a legal standard to those facts. *See, e.g.*, *Crowell*, 285 U.S. at 51 (listing examples of matters traditionally within executive cognizance); *Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 284 (1855) (upholding summary executive seizures to cover debts to the Treasury). *See also Agwilines*, 87 F.2d at 150. It might also order a party to comply with the standard going forward. *See Crowell*, 285 U.S. at 50–51; Nelson, *supra*, at 595–96. To be sure, that order might come

with some monetary penalty or award. *See Agwilines*, 87 F.2d at 150–51. *See also* Nelson, *supra*, at 597–98, 601–02 (describing nineteenth-century practice of giving agencies authority only to issue prospective orders); Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939, 944, 950–52 (2011) (describing practice as developed through judicial review of Interstate Commerce Commission orders). But the agency wasn't awarding damages "as such"; it was issuing prospective orders and attaching equitable relief. *Agwilines*, 87 F.2d at 150. *See also* Nelson, *supra*, at 597–98, 601–02; Merrill, *supra*, at 950–52.

That historical view may once have accurately described the Board's remedial powers. The Board was empowered to promote collective bargaining by, among other things, protecting the right to choose a bargaining representative. *See Jones & Laughlin*, 301 U. S. at 48; *Agwilines*, 87 F.2d at 150–51. If an employee were fired for exercising that right, the Board could order the employee reinstated. 29 U.S.C. § 160(c). It could also order the employee to be made whole—including through an award of backpay. *Id. See also Agwilines*, 87 F.2d

at 150–51. But that award merely directed an employer to restore the status quo. *Agwilines*, 87 F.2d at 150–51. It did not award private damages or remedy private harms. *Id.* ("A cease and desist order operating retrospectively is not a private award, operating by way of penalty or damages. It is a public reparation order, operating retrospectively by way of an order to cease and desist as to unfair practices, from their beginning . . . .").

Yet even if that description were accurate in the Board's early years, it no longer holds. Today, the Board awards a full panoply of financial remedies, including remedies indistinguishable from common-law damages. Under its decision in *Thryv*, the Board will now award—in every case—monetary remedies for all "direct or foreseeable pecuniary harms." 372 N.L.R.B. No. 22, 2022 WL 17974951, at *9. Those harms may include any costs incurred by an injured person, such as out-of-pocket medical expenses, early withdrawal penalties, mileage and lodging, late fees on credit cards, and penalties for missed payments on a mortgage. *Id.* at *11–13.

These are exactly the kinds of remedies awarded by common-law courts. Outside the Board, of course, the remedies go by a different

name: consequential damages. *See, e.g.*, *W.R. Hansen v. LKA Gold Inc.*, 816 F. App'x 259, 268 (10th Cir. 2020) (awarding consequential damages for credit-card charges, withdrawals from inheritance, and costs associated with liquidating house and equipment at less than fair market value); *Hennington*, 2001 WL 34373429, at *3 (affirming award of consequential damages for costs associated with borrowing and credit card debt, damage to reputation, and lost business); *Verifone, Inc. v. A Cab, LLC*, No. 215CV00157GMNGWF, 2015 WL 6443126, at *2 (D. Nev. Oct. 23, 2015) (characterizing lost revenue and additional expenses (such as additional fuel and mileage expenses) as consequential damages); *Birth Ctr. v. St. Paul Companies, Inc.*, 787 A.2d 376, 382–83 (Pa. 2001) (upholding jury verdict of compensatory damages for loss to the plaintiff's "business, reputation, and credit"). But even under that name, they cover the same real-world harms. They reimburse injured parties for any "direct" or "foreseeable" costs caused by wrongful conduct. *Hennington*, 2001 WL 34373429, at *3 ("Consequential damages may be recoverable if they are both foreseeable and directly traceable to the wrongful act."); *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 870 (Colo. 2002) ("Under either a tort or a contract standard, the

foreseeability of the consequences is a factor."); *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192–93 (2008) (explaining that New York law awards damages that are both the "natural and probable" result of the breach as well as special, or consequential damages, when the extra losses were "foreseeable and probable"); *Birth Ctr.*, 787 A.2d at 382 (explaining that Pennsylvania law awards consequential damages that are "a direct and foreseeable result of the breach"). And almost always, they are fixed and awarded by juries. *See, e.g.*, *Birth Ctr.*, 787 A.2d at 382–83 (upholding jury award of consequential damages); *W.R. Hansen*, 816 F. App'x at 268 (same); *Hennington*, 2001 WL 34373429, at *3 (same).

In fact, consequential damages are so close to *Thryv* remedies that even the Board struggles to keep them straight. In *Thyrv* itself, the Board called for amicus briefs on whether it should expand its remedial toolkit. *Thryv, Inc.*, 371 N.L.R.B. No. 37, 2021 WL 5304065, at *1 (Nov. 10, 2021). And in its amicus notice, it described the contemplated remedies as "consequential damages." *Id.* Later, it walked that characterization back. *Thryv*, 372 N.L.R.B. No. 22, 2022 WL 17974951, at *13. But it still failed to explain how its new remedies differed from

20

common-law consequential damages. *Id.* And even this Court has recognized the resemblance. Just weeks ago, reviewing the same case, this Court described the remedies as "novel, consequential-damages-like labor law remed[ies]." *Thryv, Inc. v. NLRB*, No. 23-60132, 2024 WL 2501700, at *4 (5th Cir. May 24, 2024).[5]

---

[5] This court granted Thryv's petition for review and refused to enforce the Board's order. It did so, however, on the merits: it concluded that the company had not refused to bargain before laying off certain employees. *See Thryv, Inc.*, 2024 WL 2501700, at *8. It did not have a chance to address whether the Board's new remedial scheme was proper. *See id.* But even if it had addressed that scheme, the Board would likely to continue applying it under the Board's longstanding (though controversial) "nonacquiescence" policy. *See Heartland Plymouth Ct. MI, LLC v. NLRB*, 838 F.3d 16, 21–23 (D.C. Cir. 2016) (criticizing the Board for ignoring adverse precedent within a circuit and awarding attorneys' fees to aggrieved petitioner); Ross E. Davies, *Remedial Nonacquiescence*, 89 Iowa L. Rev. 65, 100 (2003) ("The NLRB is not only not afraid to ignore the 'law of the circuit,' no matter the circuit; it insists that its ALJs do so as well."). So there is no risk that the Seventh Amendment issue will be mooted. Even if this Circuit—or multiple circuit courts—reject *Thryv*'s theory of damages, the Board will continue to apply that theory until rejected by the U.S. Supreme Court. *See Heartland Plymouth*, 838 F.3d at 22 (describing inter-circuit nonacquiescence as a way to create circuit split and improve chances of certiorari by Supreme Court). *See also* Samuel Estreicher, *Nonacquiescence by Federal Administrative Agencies*, 98 Yale L.J. 679, 681 (1989) (explaining that the Board has followed a nonacquiescence policy since the 1940s (citing *Acme Indus. Police*, 58 N.L.R.B. 1342, 1344–45 (1944))).

The Board cannot duck the Constitution through a sematic shell game. It is not the remedy's name that matters, but its substance. *See Granfinanciera*, 492 U.S. at 52 (explaining that Congress cannot "conjure away" Seventh Amendment rights by assigning traditional common-law claims to an agency). And in all but name, the Board now awards common-law consequential damages.

### III.   The Board adjudicates disputes affecting core private rights.

These parallels are so obvious that the Defendants barely bother to deny them. *See* Defs.' Response in Opp'n to Mot. for Preliminary Injunction at 28–29, *SpaceX Expl. Tech. Corp. v. NLRB*, No. 1:24-cv-00001 (Feb. 2, 2024), ECF No. 69. Instead, they rely mostly on the Supreme Court's "public rights" doctrine. *Id.* at 29 (arguing that the "public rights" doctrine is the "dispositive inquiry" here). Under that doctrine, Congress may assign a traditional common-law claim to an administrative factfinder if the claim involves public, rather than private, rights. *See Jarkesy II*, No. 22-451, slip op. at 13–18; *Granfinanciera*, 492 U.S. at 51; *Jarkesy I*, 34 F.4th at 453.

The Supreme Court has never fully distinguished between public and private rights. *See N. Pipeline Const. Co. v. Marathon Pipeline Co.*,

458 U.S. 50, 70 (1982). But historically, the distinction turned on the role courts played in protecting "core private rights"—life, liberty, and property. *See Axon*, 598 U.S. at 198–200 (Thomas, J., concurring) (surveying historical understanding); *See also* Harrison, *Jurisdiction, Congressional Power, and Constitutional Remedies*, 86 Geo. L. J. 2513, 2516–17 (1998) ("Private right was at the center of the system."). Core private rights were tied up in the founders' ideas about civil government and social contract. *Axon*, 598 U.S. at 198–200 (Thomas, J., concurring); Nelson, *supra* note 15, at 565–67. They thought some rights preexisted the state. *See* Nelson, *supra* note 15, at 567; Philip Hamburger, Is Administrative Law Unlawful? 330 (2014) (describing how natural-law theory influenced founders' understanding of separation of powers). *See also* John Locke, Second Treatise on Government § 11.135 (Dover ed. 2002) (arguing that natural law—the law existing in a state of nature—remains in effect after people form civil societies). People held certain rights as individuals and did not give them up by entering civil society. *Axon*, 598 U.S. at 198–200; Locke, *supra*, § 11.135. These rights were sometimes called individual rights, sometimes fundamental rights, sometimes natural rights. *See Axon*, No.

21-86, slip op. at 4 (Thomas, J., concurring) (explaining that private-rights doctrine developed from Lockean social-contract theory of natural rights). But whatever the label, they could be taken away only by due process of law. *See id. See also* Alexander T. MacDonald, *Originalism, Social Contract, and Labor Rights*, 99 N. Dakota L. Rev. 27, 27–29, 39–44 (2024) (collecting and surveying recent literature on the effect social contract theory had on the founding generation).

Starting in the early twentieth century, the Supreme Court started translating those concepts onto the modern administrative state. *See Crowell*, 285 U.S. at 50–51; Nelson, *supra*, at 60–02. It explained that public rights may include more than just traditional licenses and privileges. *See Crowell*, 285 U.S. at 50; *Atlas Roofing*, 430 U.S. at 450. Public rights may include new rights created by statute. *Atlas Roofing*, 430 U.S. at 460. *But see Jarkesy II*, No. 22-451, slip op. at 21–23 (explaining that statutory basis of a claim is not enough alone; claim itself not carry with it "common law soil"). When a statute created brand-new rights to advance a public purpose, the rights could qualify as public rights. *Id. Cf. also Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297 (1943). And as a result, they might fall

outside the Seventh Amendment and be properly assigned to an administrative factfinder. *See Atlas Roofing*, 430 U.S. at 460; *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 582–86 (1985).

Under that framework, courts once saw the Board as enforcing public rights. *See Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 362–63 (1940); *Jones & Laughlin*, 301 U. S. at 48; *Agwilines*, 87 F.2d at 150–51. Congress adopted the NLRA for a broad public purpose: to reduce industrial strife, promote labor peace, and thus ensure the free flow of interstate commerce. 29 U.S.C. § 151; *Agwilines*, 87 F.2d at 150. That purpose was grounded in contemporary concerns. The early twentieth century had been marred by massive strikes. *See In re Debbs*, 158 U.S. 564, 597–98 (1895) (discussing multi-state "Pullman strike"). These strikes caused widespread disruption, property damage, violence, and even death. *See, e.g.*, James A. Gross, The Making of the National Labor Relations Board: A Study in Economics, Politics, and the Law 1933-37, at 15 (1974) (discussing 1933 strike wave that led the Roosevelt administration to establish the National Labor Board, the predecessor of the National Labor Relations Board). *See also* William Forbath, Law and the Shaping of the American Labor Movement 76 – 77 (1991);

Altmon Lindsey, The Pullman Strike: The Story of a Unique Experiment of a Great Labor Upheaval (1942). The solution, Congress thought, was to funnel disputes through collective bargaining. *See* 29 U.S.C. § 151; *Jones & Laughlin*, 301 U.S. at 41–42. And to ensure that bargaining served its stabilizing purpose, Congress assigned administration to the Board. *See* 29 U.S.C. § 153. *See also Nat'l Licorice Co.*, 309 U.S. at 362 ("The Board acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce . . . .").

The Board's mission was important, but limited. It was instructed to promote labor peace—and thus protect interstate commerce—by enforcing the NLRA's bargaining requirements. *Nat'l Licorice Co.*, 309 U.S. at 362–63. That purpose was ostensibly a public one: it centered on protecting the public interest in labor peace. *See id.* And by the same token, it was unconcerned with private injuries. *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 192–93 (1941) (explaining that the Board was not created to remedy "private injuries"). Any remedies the Board awarded were merely incidental to its commerce-and-peace-promoting mission. *See Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197,

235–36 (1938). In short, the Board was supposed to safeguard "public, not private, rights." *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 543 (1943).

But whatever the merits of that original view, it no longer describes the Board's activities. The modern Board has strayed far from its original mission. It focuses less on securing interstate commerce and more on redressing private wrongs. And through steady administrative accretion, it has aggrandized its power over core private rights.

The examples could fill volumes. For instance, the Board has recently expanded union access to private property, even when the property owner is someone other than the primary employer. *Bexar Cnty. Performing Arts Ctr. Found.*, 372 N.L.R.B. No. 28, 2022 WL 18107715, at *1 (Dec. 16, 2022). The Board has also expanded access to an employer's equipment and information technology. *See Purple Commc'ns, Inc.*, 361 N.L.R.B. 1050, 1050 (2014) (expanding employee access to employer systems), *overruled by Rio All-Suites Hotel and Casino*, 368 N.L.R.B. No. 143, slip op. at 1 (2019). *See also* NLRB Gen. Counsel Memo. No. 21-04 (Aug. 12, 2021) (identifying *Rio All-Suites* as a target for reconsideration to return to standard adopted in *Purple*

*Commc'ns*). It has even regulated the terms of employee handbooks—traditionally, a matter of state contract law. *See Stericycle, Inc.*, 372 N.L.R.B. No. 113, slip op. at 1 (2023); Richard Harrison Winters, *Employee Handbooks and Employment-at-Will Contracts*, 1985 Duke L.J. 196, 198 (1985) (discussing status of employee handbooks under common-law contract rules).

And even more radical changes are afoot. For example, the NLRB General Counsel recently wrote that the Board should treat noncompete agreements and other restrictive covenants as unfair labor practices. *See* NLRB Gen. Counsel Memo. No. 23-09 (May 30, 2023). Yet those same covenants have been regulated under the common law for centuries. *See, e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 279 (6th Cir. 1898) (Taft, J.) ("From early times it was the policy of Englishmen to encourage trade in England, and to discourage those voluntary restraints which tradesmen were often induced to impose on themselves by contract."); *Mitchel v. Reynolds* [1711] 24 Eng. Rep. 347, 350 (explaining that voluntary restraints on trade were unlawful under the common law when they deprived another person "of his livelihood" and deprived the public of a "useful member"). The General Counsel

also recently wrote that the Board should regulate the use of productivity and monitoring tools—tools, she argues, that chill protected activity by their very presence. *See* NLRB Gen. Counsel Memo. No. 23-02 (Oct. 31, 2022). But of course, any restriction on those tools would affect otherwise valid property rights. *See, e.g.*, *Tesla, Inc. v. NLRB.*, 86 F.4th 640, 649 (5th Cir. 2023) (explaining that Section 7 of the NLRA requires courts and the Board to balance between statutory and property rights); *Cap. Med. Ctr. v. NLRB*, 909 F.3d 427, 434 (D.C. Cir. 2018) (same).

This kind of regulation wanders far afield from the Board's original mission. It has little connection to the free flow of commerce. Instead, it implicates disputes over core property and contract rights—the kind historically reserved to courts and juries. *See, e.g.*, *Jarkesy II*, No. 22-451, slip op. at 1–2 (Gorsuch, J., concurring); *Axon*, 598 U.S. at 198–200 (Thomas, J., concurring) (describing historical practice of requiring judicial determination for matters affecting core life, liberty, or property rights); Nelson, *supra*, at 605 (same).

But property and contract rights are far from the only rights affected. The Board's recent activity also affects fundamental

constitutional rights. For example, the General Counsel has asserted that so-called captive audience meetings, in which an employer expresses its views about labor issues, are unfair labor practices. *See* NLRB Gen. Counsel Memo. No. 22-04 (April 7, 2022). And she has stated her intent to prosecute employers for that kind of speech. *See id.* *Cf. Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 67 (2008) (recognizing that Section 8(c) and the First Amendment protect employer speech about labor matters). Similarly, the Board has expanded the rights of workers to access private property without permission. *See Bexar Cnty.*, 372 N.L.R.B. No. 28, 2022 WL 18107715, at *1. That kind of expansion limits the owner's right to exclude and thus implicates the Fifth Amendment's Takings Clause. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (holding that uncompensated mandatory access for union organizers under California law violated the Takings Clause).

In short, the modern Board no longer simply promotes bargaining to ensure labor peace. It also regularly wades into disputes affecting core contract, property, and constitutional rights. The Board tries to justify these incursions as side effects of its broader statutory mission.

*See Thryv*, 372 N.L.R.B. No. 22, 2022 WL 17974951, at *13. But if merely pointing to a statute were enough to dispense with the Seventh Amendment, the Amendment would mean nothing. It would offer no check on Congress, no limit on agencies, and no protection for individual liberty. *See Granfinanciera*, 492 U.S. at 52; *Jarkesy I*, 34 F.4th at 457 ("Congress cannot change the nature of a right, thereby circumventing the Seventh Amendment, by simply giving the keys to the [agency] to do the vindicating.").

That problem would be enough on its own. But it is aggravated by the Board's politically driven policy gyrations. From administration to administration, the Board has increasingly shifted the "law" to suit partisan preferences. To cite only a few examples, the Board recently changed its "joint employer" standard four times in ten years. *See Chamber of Com. of U.S. v. NLRB*, No. 6:23-CV-00553, 2024 WL 1203056, at *4 (E.D. Tex. Mar. 18, 2024) (describing shifts and setting aside latest attempt as arbitrary, capricious, and contrary to law). It did the same with its worker-classification standards. *Compare Atlanta Opera, Inc.*, 372 N.L.R.B. No. 95, slip op at 1 (2023), *with SuperShuttle DFW, Inc.*, 367 NLRB No. 75 (2019), *and FedEx Home Delivery*, 361

NLRB 610 (2014). And it likewise swung the rules governing employee handbooks, changing policy four times over four presidential administrations. *Compare Stericycle, Inc.*, 372 N.L.R.B. No. 113, slip op. at 1 (2023), *with Boeing Co.*, 365 N.L.R.B. No. 154 (2017), *Whole Foods Market, Inc.*, 363 NLRB 800, 803 n. 11 (2015), *and Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004).

These shifts have become increasingly volatile. According to one study, during the Obama Administration, the Board overturned precedents that had been on the books for more than a collective 4,000 years. *See* Coalition for a Democratic Workforce, *supra*, at 1, 3. *Cf. also* Michael C. Harper, *The Case for Limiting Judicial Review of Labor Board Certification Decisions*, 55 Geo. Wash. L. Rev. 262, 299 (1987) (observing that while it is hard for a single president to shift the outlook of the judiciary through appointments, it is easy to do so through appointments to the Board). These shifts have become so volatile that they have caught the attention even of some Supreme Court Justices, who recently cited the Board as an example of administrative instability. *See* Transcript of Oral Argument, *Loper Bright Enters. v. Raimondo*, No. 22-451 (U.S. Jan. 17, 2024) (Justice Kavanaugh) (asking

counsel to address stability argument in context of the Board, which "moves from pillar to post fairly often").

The result is that today, core private rights are subject to the outcomes of political elections. Property, contract, and constitutional rights have come to depend on the policy preferences of politicians and agency personnel. *See, e.g.*, James J. Brudney, *Isolated and Politicized: The NLRB's Uncertain Future*, 26 Comp. Lab. L. & Pol'y J. 221, 227 (2005) (observing that partisan pressure has combined with Board's "ability and willingness to depart so readily from its own precedent" to undermine its original mission); Semet, *supra*, at 257 (finding almost a 50% swing in average outcome depending on the partisan makeup of a Board panel). Yet that is exactly what the Seventh Amendment is supposed to prevent. *See Easton*, 106 U.S. at 412 (describing the jury-trial right as a "fundamental" guarantor of individual liberty).

The Seventh Amendment was designed to guarantee that core private rights would not be denied without the intervention of a jury. And that guarantee still stands today. No less than it did in 1791, the Seventh Amendment still protects a person's access to a jury of his or her peers in all cases arising at common law. The modern Board stands

as an obstacle to that guarantee. It is unconstitutional and should be so

declared.

Respectfully submitted,

*s/ Alex T. Macdonald*
Alex T. MacDonald
LITTLER MENDELSON, P.C.
Workplace Policy Institute
815 Connecticut Avenue, NW
Suite 400
Washington, D.C.  20006-4046
(202) 772-2505
amacdonald@littler.com

*Counsel for Amicus Curiae*
  *Coalition for a Democratic Workplace*

CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

*s/ Alex T. Macdonald*
Alex T. MacDonald
LITTLER MENDELSON, P.C.
Workplace Policy Institute
815 Connecticut Avenue, NW
Suite 400
Washington, D.C.  20006-4046
(202) 772-2505
amacdonald@littler.com

*Counsel for Amicus Curiae*
  *Coalition for a Democratic Workplace*

CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitation set forth in set forth in FRAP 32(a)(7)(A). This brief contains 6,433 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word in 14-point font size in Century Schoolbook.

*s/ Alex T. Macdonald*
Alex T. MacDonald
LITTLER MENDELSON, P.C.
Workplace Policy Institute
815 Connecticut Avenue, NW
Suite 400
Washington, D.C.  20006-4046
(202) 772-2505
amacdonald@littler.com

*Counsel for Amicus Curiae*
  *Coalition for a Democratic Workplace*